701 So.2d 507 (1997)
BMW OF NORTH AMERICA, INC.
v.
Ira GORE, Jr.
1920324.
Supreme Court of Alabama.
May 9, 1997.
Rehearing Denied August 15, 1997.
*508 Michael C. Quillen and Samuel M. Hill of Walston, Stabler, Wells, Anderson & Bains, Birmingham, for appellants.
Andrew L. Frey and Evan M. Tager of Mayer, Brown & Platt, Washington, D.C.; for BMW of North America, Inc.
Michael A. Epstein, Steven Alan Reiss, and Beth K. Neelman of Weil, Gotshal & Manges, New York City, for Bayerische Motoren Werke, A.G.
Andrew W. Bolt II, Paula I. Cobia, and Stephen K. Wollstein of Bolt, Isom, Jackson and Bailey, Anniston; and John W. Haley and Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham, for appellee.
C. Clay Torbert III of Capell, Howard, Knabe & Cobbs, P.A., Montgomery; for amicus curiae Alabama Development Office in support of appellants.
Hobart A. McWhorter, Jr., Linda A. Friedman, and John E. Goodman of Bradley, Arant, Rose & White, Birmingham; and Charles A. Newman and Lawrence C. Friedman of Thompson & Mitchell, St. Louis, MO; for amici curiae American Automobile Manufacturers Association, Inc., and Association of International Automobile Manufacturers, Inc.
Fourier J. Gale III of Maynard, Cooper & Gale, P.C., Birmingham; and S. Allen Baker, Jr., of Balch & Bingham, Birmingham; for amicus curiae Business Council of Alabama, in support of appellants.

On Remand from the United States Supreme Court
PER CURIAM.
The United States Supreme Court has vacated our earlier judgment in this case and has remanded the cause for our further consideration in accordance with BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).
The facts are set out in their entirety in BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994),[1] and we note them here only briefly: Dr. Ira Gore, the purchaser of a BMW automobile, sued BMW of North America, Inc. ("BMW"), alleging, among other things, that BMW and Bayerische Motoren Werke, A.G., the foreign manufacturer of the automobile, had fraudulently failed to disclose to him that the automobile he was purchasing had been repainted after being damaged by acid rain during its shipment from Germany. At trial, BMW admitted that the car had been damaged and that *509 BMW had a nationwide policy not to advise its dealers of predelivery damage to new cars when the cost of repair did not exceed three percent (3%) of the car's suggested retail price. The jury returned a verdict for Gore, awarding him $4,000 in compensatory damages and $4 million in punitive damages. The trial court denied BMW's post-trial motion challenging the punitive damages award as excessive; however, on appeal, this Court determined that the $4 million award was excessive and ordered a reduction to $2 million.[2] The United States Supreme Court granted BMW's petition for certiorari review.
The United States Supreme Court announced, for the first time and by a 5-4 vote, that a punitive damages award, even one that is the product of a fair trial, may be so large as to violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The Supreme Court determined that, under the Due Process Clause, a defendant has the right to fair notice not only of the conduct that may subject him to punishment, but also of the severity of the penalty that a state may impose for such conduct. BMW, 517 U.S. at ___, 116 S.Ct. at 1598. The Supreme Court recognized that a state may impose punitive damages to further its legitimate interest in punishing misconduct and deterring a repetition of that conduct. 517 U.S. at ___, 116 S.Ct. at 1595. To that end, a state has flexibility in determining the level of punitive damages the state will allow in different classes of cases. Id. The Supreme Court held that an award of punitive damages enters "the zone of arbitrariness that violates the Due Process Clause only when that award can be fairly categorized as `grossly excessive'" in relation to those legitimate interests. Id. The Supreme Court then set out the following three "guideposts" by which a reviewing court could determine whether a punitive damages award is constitutionally excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the plaintiff's award of compensatory damages and the amount of the punitive damages; and (3) the difference between the punitive damages award and the civil or criminal sanctions that could be imposed for comparable misconduct. 517 U.S. at ___, 116 S.Ct. at 1599.
Charting its review by these guideposts, the Supreme Court found that BMW's action was not highly reprehensible and noted that BMW could have incurred only a mere $2,000 fine under Alabama consumer fraud law for its action. It also emphasized that the plaintiff, a successful medical doctor who was not "financially vulnerable," had suffered only $4,000 in purely economic damages. Id. Under these facts, the Supreme Court concluded that BMW could not have reasonably anticipated that its actions could incur a punitive damages award of $4 million or even a reduced award of $2 million; thus, the Supreme Court held, the award violated BMW's due process rights. The Supreme Court then remanded the case to this Court, for us to reassess the punitive damages award for excessiveness in view of its opinion.
We point out that, in providing three guideposts by which to review the excessiveness of a punitive damages award, the majority in BMW did not dismiss the review process already established by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and upheld by the United States Supreme Court in Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Indeed, the first two "guideposts" are already included in a Hammond-Green Oil review; the first consideration of the review is the relationship of the amount of the punitive damages award to the harm that the defendant's action has caused or is likely to cause, and the second consideration is the degree of reprehensibility of the defendant's conduct.
Moreover, in his special concurrence in BMW, Justice Breyer discussed the Green Oil factors as a means of reasonable constraint upon arbitrary and fundamentally unfair punitive damages awards. Joined by Justices O'Connor and Souter, Justice Breyer specifically stated that the factors of the *510 Hammond-Green Oil review may make up for the lack of significant statutory constraint against excessive punitive damages awards in Alabama. 517 U.S. at ___, 116 S.Ct. at 1605. It was not the Green Oil factors themselves, but this Court's application of them in this case that Justice Breyer found objectionable.
Thus, as we read the BMW opinion, the United States Supreme Court's guideposts are not intended to exclude judicial consideration of other factors that might bear on the question of excessiveness; this Court has considered other such factors for some years. We see the three guideposts as factors to be emphasized in a judicial review of a punitive damages award pursuant to Hammond, Green Oil, and Ala.Code 1975, § 6-11-23(b). In sum, the United States Supreme Court's BMW decision seems to hold that the presumption of validity Alabama extends to a jury verdict must yield to a more meaningful judicial review of that verdict when it is challenged by a tortfeasor as excessive.

I.
Until the United States Supreme Court released its decision in BMW, it was generally assumed that a statute stating that intentional fraud would subject a tortfeasor to such punitive damages as a jury might assess in a fair trial was sufficient notice of the severity of the punishment that might be inflicted. The Supreme Court held in BMW that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." 517 U.S. at ___, 116 S.Ct. at 1598. The Supreme Court cited only criminal cases in support of this proposition and acknowledged that "[t]he strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases." 517 U.S. at ___ n. 22, 116 S.Ct. at 1598 n. 22. However, the Court went on to state that "the basic protection against `judgments without notice' afforded by the Due Process Clause, Shaffer v. Heitner, 433 U.S. 186, 217, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in judgment), is implicated by civil penalties." 517 U.S. at ___n. 22, 116 S.Ct. at 1598 n. 22 (emphasis original). The Court concluded that each of the three guideposts (the reprehensibility of BMW's conduct, the ratio of the punitive damages award to the compensatory damages award, and comparison with applicable civil and criminal sanctions) indicated to it that BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose on it for its misconduct.
The Supreme Court's decision in BMW now requires that state courts reviewing jury verdicts challenged as violating the federal Due Process Clause determine whether the tortfeasor had adequate notice that the conduct for which the jury found him liable could subject him to punishment. Due process also requires, and state courts must now determine, whether the tortfeasor had adequate notice of the severity of the penalty that might be imposed for the activity he engaged in.
Alabama, by statute, provides notice concerning the conduct that will subject one to punitive damages in this state. Ala.Code 1975, § 6-11-20, expressly sets forth and defines the acts, as well as the state of mind:
"(a) Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff....

"(b) As used in this article, the following definitions shall apply:
"(1) FRAUD. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"(2) MALICE. The intentional doing of a wrongful act without just cause or excuse, either:

*511 "a. With an intent to injure the person or property of another person or entity, or
"b. Under such circumstances that the law will imply an evil intent.
"(3) WANTONNESS. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
"(4) CLEAR AND CONVINCING EVIDENCE. Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.
"(5) OPPRESSION. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."
(Emphasis added.)
Alabama, by providing a judicial review of punitive damages, provides notice of the range of amounts of punitive damages a defendant may expect to pay for conduct described in § 6-11-20. This Court refined the elements of judicial review for excessiveness of jury verdicts in 1989 by adding specific Green Oil factors to the Hammond review. We have reviewed the published opinions since that time in which this Court and the Court of Civil Appeals have affirmed awards of punitive damages, excluding wrongful death cases, and the five cases now here on remand from the United States Supreme Court.[3] These opinions show that the overall application of the Hammond-Green Oil review by the Alabama judiciary has imposed a substantial restraint upon arbitrariness in punitive damages awards and also has provided notice of the amount of punitive damages a jury might impose.[4] Thus, § 6-11-20, in conjunction with the sizable body of case law supplementing it, serves as clear notice to all of the action Alabama deems sufficiently reprehensible to warrant an award of punitive damages and the level to which a defendant may be punished for such conduct. All who would conduct activities in Alabama are presumed to know its laws. Barber Pure Milk Co. v. Alabama State Milk Control Bd., 275 Ala. 489, 156 So.2d 351 (1963).

II.
We now consider again the Green Oil factors, as we view them now in light of the Supreme Court's decision in BMW, in order to determine the extent to which the punitive damages award in this case is excessive. The Supreme Court has instructed this Court that a $2 million civil penalty against BMW is grossly excessive in relation to the wrongful conduct the jury found BMW guilty of committing, and we begin our review with that in mind. We will first discuss the three guideposts set out by the United States Supreme Court, two of which are already factors of a Hammond-Green Oil review, and we will then discuss the remaining Green Oil factors.

*512 A. Degree of Reprehensibility

According to the Supreme Court, the degree of reprehensibility of the defendant's conduct is perhaps the "most important indicium of the reasonableness of a punitive damages award." BMW, 517 U.S. at___, 116 S.Ct. at 1599. Reprehensibility of the defendant's conduct is one of the factors Alabama courts consider in the common law excessiveness review required by Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
"`The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.'"
539 So.2d at 223.
Courts in Alabama consider this factor as part of a Hammond-Green Oil review, but perhaps have not heretofore given it the weight the Supreme Court in BMW says the Constitution requires in an excessiveness review of a jury verdict in a civil case. As articulated in Green Oil, this factor encompasses considerations such as "the duration of [the defendant's] conduct, the degree of the defendant's awareness of any hazard ... his conduct has caused or is likely to cause,... any concealment or `cover-up' of that hazard, and the existence and frequency of similar past conduct." Alabama statutes also require that a court consider whether the defendant has been guilty of the same or similar acts in the past and that it consider the efforts made to remedy the wrong. § 6-11-23(b). To these considerations, the Supreme Court in BMW adds two others that principally determine reprehensibility: (1) the defendant's awareness of his actions or omissions causing harm and (2) the quality and quantity of rights of others that were disregarded by the defendant.
In discussing the element of reprehensibility, the United States Supreme Court stated:
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect `the enormity of his offense.' ... This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that `nonviolent crimes are less serious than crimes marked by violence or the threat of violence.'... Similarly, `trickery and deceit'... are more reprehensible than negligence...."
517 U.S. at___, 116 S.Ct. at 1599 (citations and footnotes omitted). Applying this guidepost to the facts in BMW, the United States Supreme Court concluded that BMW's conduct was not sufficiently reprehensible to warrant the imposition of a $2 million exemplary damages award. The Supreme Court emphasized that the damage to the well-to-do plaintiff was purely economic in nature. While the Court recognized that economic damage inflicted upon a financially vulnerable plaintiff might well support a large punitive damages award, the fact that the plaintiff in this case was affluent weighed against a finding of great reprehensibility. The Supreme Court also pointed out that BMW's behavior "evinced no indifference to or reckless disregard for the health and safety of others". 517 U.S. at ___, 116 S.Ct. at 1599. The Supreme Court held:
"The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. The fact that a multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers. In the absence of a history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient to motivate full compliance with the disclosure requirement imposed by the Alabama Supreme Court in this case."
517 U.S. at ___, 116 S.Ct. at 1603.
After reconsidering the element of reprehensibility with the added emphasis the Supreme *513 Court in BMW has placed upon it, we agree that, while BMW's conduct was reprehensible enough to justify the imposition of punitive damages, it was not so reprehensible as to justify the imposition of a $2 million penalty.

B. Ratio of Actual or Likely Harm to Punitive Damages
The United States Supreme Court in BMW stated that the "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff," and it stated that "exemplary damages must bear a `reasonable relationship' to compensatory damages." 517 U.S. at ___, 116 S.Ct. at 1601. However, the Court expressly held that due process does not require a purely mathematical formula:
"Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.... Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.... In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."
517 U.S. at___, 116 S.Ct. at 1602-03 (citations and emphasis omitted).
Applying this guidepost to the facts in BMW, the United States Supreme Court reasoned that due process does not require any exact ratio between punitive and compensatory assessments, but that a high ratio might indicate excessiveness, particularly if the conduct of the defendant was not especially reprehensible. The Court noted that the $2 million punitive damages award is 500 times the amount of actual harm suffered, as determined by the jury, and 35 times the total actual harm suffered by the 14 Alabama consumers who had purchased repainted BMWs. 517 U.S. at ___and n. 35, 116 S.Ct. at 1602 and n. 35. The Supreme Court recognized that it had upheld a $10 million punitive damages award in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711,125 L.Ed.2d 366 (1993), where the jury had awarded only $19,000 in actual damages (a punitive damages to compensatory damages ratio of over 500 to 1), but it emphasized that the plaintiffs in that case had faced much greater potential harm and that if the defendant had succeeded in its plan the ratio would have been less than 10 to 1. 517 U.S. at___, 116 S.Ct. at 1602. The Court thus distinguished TXO by finding that "there is no suggestion that Dr. Gore or any other BMW purchaser was threatened with any additional potential harm by BMW's nondisclosure policy"; it therefore concluded that the 500 to 1 ratio "must surely `raise a suspicious judicial eyebrow.'" 517 U.S. at ___ and ___, 116 S.Ct. at 1602 and 1603, quoting TXO, 509 U.S. at 481, 113 S.Ct. at 2732 (O'Connor, J., dissenting).
Although it is difficult to determine case by case what ratio of punitive damages to compensatory damages is excessive, we reject the easy answer of adopting one ratio that would apply to all and would therefore give a wrongdoer precise notice of the penalty that his misconduct might incur. To do so would frustrate the purpose of punitive damages, which is to punish and deter a defendant's misconduct. A ratio that could be deemed reasonable in many cases might well be insufficient in cases where the defendant has reaped great profit from its conduct, or where its conduct is particularly reprehensible. Indeed, the United States Supreme Court has consistently stated, "We need not, and indeed cannot, draw a mathematical bright line between the constitutionally acceptable and constitutionally unacceptable that would fit every case." TXO, 509 U.S. at 458, 113 S.Ct. at 2720, quoting Haslip, 499 U.S. at 18, 111 S.Ct. at 1043. Likewise, we do not draw a bright line here; however, in light of the lesser degree of reprehensibility apparent in this case, as well as the other considerations of this review, we agree that the 500 to 1 ratio of punitive damages to *514 compensatory damages in this case is grossly excessive.

C. Sanctions for Comparable Misconduct
The Supreme Court in BMW required state courts, when reviewing punitive damages verdicts for excessiveness, to "compare[e] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at ___, 116 S.Ct. at 1603. State courts engaged in this endeavor should "`accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" 517 U.S. at ___, 116 S.Ct. at 1603, quoting Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part). However, under the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8-19-5, the maximum sanction for committing a fraudulent act against an Alabama consumer is a meager $2,000. Because the legislature has set the statutory penalty for deceitful conduct at such a low level, there is little basis for comparing it with any meaningful punitive damages award, particularly where the defendant is wealthy and the profit gained from the fraudulent act is substantial. In this case, the maximum statutory penalty does not even remove the profit BMW realized from the sale of the damaged automobile to Gore. Accordingly, a consideration of the statutory penalty does little to aid in a meaningful review of the excessiveness of the punitive damages award.

D. Does the Punitive Damages Award Remove the Defendant's Profit?
In a Hammond-Green Oil review, we are required to determine whether, if the wrongful conduct was profitable to the defendant, the punitive damages removed that profit and was in excess of the profit, so that the defendant recognizes a loss. Green Oil, 539 So.2d at 223. The jury determined that Gore suffered damage because he purchased an automobile that had an actual value $4,000 less than it was represented to be. There was also evidence that as many as 14 Alabamians each had purchased an automobile from BMW with a value less than it was represented to be, because of undisclosed repainting. Although we cannot calculate the exact amount of total profit BMW realized from the 14 sales, we agree that an award of $2 million greatly exceeds the highest amount that it could possibly be.

E. The Financial Position of the Defendant
It is clear that a punitive damages award of $2 million would not have a devastating impact upon BMW's financial position. However, where a defendant has not committed an act that would warrant a large punitive damages award, such an award should not be upheld upon judicial review merely because the defendant has the ability to pay it. In a Hammondr-Green Oil review, a consideration of the defendant's wealth must necessarily be open-ended; however, we suggest that a trial court might consider whether a punitive damages award that exceeds 10% of the defendant's net worth crosses the line from punishment to destruction, particularly where the defendant's conduct is not highly reprehensible. Thus, the fact that a punitive damages award exceeds 10% of the defendant's net worth could suggest that the award should be reduced.

F. The Costs of Litigation
As this Court recognized in its original opinion in this case, the costs associated with this trial were substantial. 646 So.2d at 625. However, where other Green Oil factors do not support a large punitive damages award, substantial litigation costs borne by the plaintiff will not alone justify the award.

G. Criminal Sanctions
A Hammond-Green Oil review requires us to consider whether criminal sanctions have been imposed on the defendant for the conduct made the basis for an award of punitive damages and, if so, the nature and extent of those sanctions. No criminal sanctions were imposed upon BMW for its conduct, so this factor is irrelevant here.

*515 H. Other Civil Actions

As this Court noted in the original opinion in this case, 646 So.2d at 625-26, several other civil actions have been filed that are based upon the same conduct by BMW. We must view this fact as weighing against the punitive damages award.

III. Conclusion
After carefully reconsidering this case, analyzing the Hammond-Green Oil factors in the light of the United States Supreme Court's opinion in BMW, and incorporating the guideposts articulated therein, we agree that the $2 million award of punitive damages against BMW was grossly excessive. For guidance in determining the amount of punitive damages that would be proper, we have looked to comparable cases of fraud in the sale of an automobile, particularly American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985), and German Auto, Inc. v. Tamburello, 565 So.2d 238 (Ala.1990).
In Tamburello, the plaintiff bought a BMW automobile that was represented and warranted to be new and undamaged. After the purchase, the plaintiff discovered that the left rear fender of the automobile had been damaged and repainted. The plaintiff ultimately sued the BMW dealer, alleging fraud, among other claims. The jury awarded the plaintiff $2,350 in compensatory damages and $10,815 in punitive damages, and this Court affirmed a judgment based on that verdict. In Tamburello, as in the instant case, the damage to the automobile had no effect on its safety features or performance and the repairs necessitated by the damage were merely cosmetic. Moreover, the loss to the plaintiff was purely economic, and there was no evidence that the plaintiff was financially vulnerable. The ratio of punitive damages to compensatory damages was only in the range of 5:1.
In American Honda, the plaintiff purchased a foreign automobile that the dealer represented as new, but which actually had been damaged en route to the United States and had been repaired at the port of entry before it was shipped to the dealership. The plaintiff sued both the automobile dealer and the automobile distributor, American Honda Motor Company, Inc. ("American Honda"), alleging fraud, deceit, and breach of warranty. The trial court directed a verdict for the automobile dealer, and the jury subsequently returned a general verdict of $65,000 against American Honda. Because the verdict was a general one, the exact ratio of punitive damages to compensatory damages cannot be determined. We do note that, although the defendants in Tamburello and American Honda committed similar conduct, the larger judgment in American Honda was against a national automobile distributor, presumably a larger and wealthier entity than the local automobile defendant in Tamburello.
We do not imply that the 5:1 ratio in Tamburello should be the benchmark of every case, or that the wealth of a defendant like American Honda is the most critical factor for a court to consider when reviewing a punitive damages award for excessiveness. On the contrary, the reviewing court should apply all the Green Oil factors, including the three BMW "guideposts," on a case-by-case basis to determine whether a punitive damages award is excessive and, if so, to what extent it should be remitted. However, we do agree that the facts in Tamburello and American Honda make those cases particularly useful for comparison to the instant case and that a punitive damages award within the range of the awards in those cases is appropriate here.
The trial court's order denying BMW's motion for a new trial is affirmed on the condition that the plaintiff file with this Court within 21 days a remittitur of damages to the sum of $50,000; otherwise, the judgment will be reversed and this cause remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
*516 SHORES, KENNEDY, and BUTTS,[**] JJ., concur.
ALMON[***] and COOK,** JJ., concur specially.
HOOPER, C.J.,** and MADDOX and HOUSTON, JJ., concur in the result.
SEE, J.,** recuses.
ALMON, Justice (concurring specially).
Although I did not vote in BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala. 1994), I now vote to concur with the majority opinion issued today after the remand from the Supreme Court of the United States. I write specially to note that, while I agree under all the circumstances with the remittitur ordered today, it appears to me that the deterrent effect of the original award, which changed BMW's national policy in a way that benefited purchasers of its automobiles, has been unduly minimized as this case has proceeded through successive stages of review.
COOK, Justice (concurring specially).
I concur in the result and the reasoning of the main opinion. Although I do concur, and, although I did not vote in BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994), I write specially now to discuss briefly the aspect of this case that I believe has created all the difficulty and confusion.
Specifically, the jury awarded Gore $4 million in punitive damages; this Court concluded that that amount was "based upon a multiplication of $4,000 (the diminution in value of the Gore vehicle) times 1,000 (approximately the number of refinished vehicles sold in the United States)." 646 So.2d at 627 (emphasis added). However, the Court also held that "this jury could not use the number of similar acts that a defendant [had] committed in other jurisdictions as a multiplier when determining the dollar amount of [the] punitive damages award." Id. (emphasis in original). The actual number of sales of refinished vehicles in Alabama was, "at most, only 14." Id. at 623.[5] Thus, if the jury had employed the same mathematical process, using the proper multiplier, namely, 14, rather than 1000, its punitive damages award would have been but $56,000 ($4,000 x× 14).
The United States Supreme Court expressed its own concern in the following manner:
"In light of the Alabama Supreme Court's conclusion that (1) the jury had computed its award by multiplying $4,000 by the number of refinished vehicles sold in the United States and [that (2)] the award should have been based on Alabama conduct, respect for the error-free portion of the jury verdict would seem to produce an award of $56,000 ($4,000 multiplied by 14, the number of repainted vehicles sold in Alabama)."
BMW of North America, Inc. v. Gore, 517 U.S. 559, ___, 116 S.Ct. 1589,1595 n. 11,134 L.Ed.2d 809 (1996).
Obviously, the $50,000 figure we approve today is slightly less than the $56,000 the jury would have awarded had it based its calculations on the proper multiplier. For this reason, and because I also believe that the analysis of the main opinion in arriving at its figure is sound, I concur.
HOUSTON, Justice (concurring in the result).

I. The Problem
The Due Process Clause of the Constitution of the United States provides:
"No State shall ... deprive any person of life, liberty, or property, without due process of law ...." *517 U.S. Const., Amend. XIV, § 1. In Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the United States Supreme Court held that an award of punitive damages this Court had found reasonable under state law did not violate the defendant's federal due process rights. In 1996, however, in the case now before us on remand, the Supreme Court held that another punitive damages award that had survived a reasonableness review by this Court did violate the defendant's due process rights. The Supreme Court established three broad "guideposts" for determining whether an award is constitutionally excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damages award to the compensatory damages award; and (3) the magnitude of civil and criminal sanctions for comparable misconduct. BMW of North America, Inc. v. Gore, 517 U.S. 559 at ___ ___, 116 S.Ct. 1589 at 1598-99, 134 L.Ed.2d 809 (1996). Applying these guideposts to the facts in this case, the Supreme Court held, for the first time ever, that a punitive damages award that had survived a state law reasonableness review nonetheless exceeded the "outer limit" of federal due process. Id.

One of the first cases the Supreme Court of the United States agreed to review from Alabama that raised the federal constitutional issue was Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). After Aetna had been argued before the Supreme Court on December 4, 1985, but before that Court had issued its opinion, a plurality of this Court (with two Justices recused and three Justices dissenting as to this issue), in Alabama Farm Bureau Mutual Casualty Ins. Co. v. Griffin, 493 So.2d 1379,1384 (Ala.1986), wrote:
"This Court has not established specific standards for trial courts to apply in granting or denying new trial motions on the grounds of excessiveness. General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala. 1985). We presume that a trial court's ruling on the issue of damages is correct and we will not disturb such a ruling unless we find it to be plain and palpable error."
On April 22, 1986, the Supreme Court vacated the $3.5 million punitive damages award in Aetna on the ground that one of the participating Justices should have recused in the case, but the Court did not reach the constitutional issues raised in that case. Instead, the Court wrote that the case presented "important [federal constitutional] issues which, in an appropriate setting, must be resolved." 475 U.S. at 828-29, 106 S.Ct. at 1589. One issue was whether lack of sufficient standards governing punitive damages awards in Alabama violates the Due Process Clause of the Fourteenth Amendment. See 475 U.S. at 828,106 S.Ct. at 1589.
In an effort to provide guidance, primarily to trial judges, this Court, on July 11, 1986, without mentioning the dicta in Aetna, adopted a new procedure requiring trial judges to indicate on the record the reasons for interfering with a jury verdict on grounds of excessiveness of the punitive damages awarded or the reasons for refusing to do so. See Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986); see also Harmon v. Motors Ins. Corp., 493 So.2d 1370 (Ala.1986). On July 11, 1986, this Court also denied rehearing in Alabama Farm Bureau v. Griffin, supra, wherein a plurality of this Court had stated that this Court had not established specific standards for trial courts to apply in granting or denying new trial motions based on grounds of excessiveness; however, this Court granted a subsequent rehearing in Alabama Farm Bureau v. Griffin on October 31, 1986, and remanded the case for the trial court to enter an order consistent with Hammond v. City of Gadsden.
When Aetna was remanded by the United States Supreme Court to this Court, this Court ordered a remittitur of $3,000,000 of the $3,500,000 punitive damages award. Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987). On remand three Justices concurred specially.[6] In 1987, the Alabama *518 Legislature enacted a number of laws affecting the amount of punitive damages, as well as the method of imposing those damages.
In Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), this Court adopted the seven factors set out in my special concurrence in Aetna, 505 So.2d at 1060-62, as factors that "could be taken into consideration by the trial court in determining whether the jury award of punitive damages is excessive or inadequate." 539 So.2d at 223. This Court and our trial courts were applying the Green Oil standards and the judicial procedure for reviewing punitive damages awards for excessiveness that had been previously established in Hammond, Harmon, and Green Oil, when the Supreme Court of the United States granted certiorari review to consider this Court's judgment in Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). On March 4, 1991, the Supreme Court affirmed, noting that the punitive damages award was "more than 4 times the amount of compensatory damages, [was] more than 200 times the out-of-pocket expenses of respondent Haslip, ... and, of course, [was] much in excess of the fine that could be imposed for insurance fraud" in Alabama. 499 U.S. at 23, 111 S.Ct. at 1046. In Haslip, the majority stated:
"While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it does not cross the line into the area of constitutional impropriety."

499 U.S. at 23-24, 111 S.Ct. at 1046 (emphasis added).[7]
*519 In addition to vacating the judgment in this case, the Supreme Court of the United States also vacated this Court's judgments in Life Insurance Co. of Georgia v. Johnson, 684 So.2d 685 (Ala.1996), Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995), Union Security Life Insurance Co. v. Crocker, 667 So.2d 688 (Ala.1995), and American Pioneer Life Insurance Co. v. Williamson, 681 So.2d 1040 (Ala.1995), and remanded those cases to us for further consideration in light of its decision in this case. On remand, this Court faces the twin tasks of complying with express United States Supreme Court precedent indicating that there is no precise definition of the "outer limit" of federal due process protection,[8] and, at the same time, providing practical guidance for Alabama's trial judges to review the amounts of punitive damages awards.[9] An examination of the origin of the conflict between state law and federal due process requirements reveals that these objectives can be achieved by returning to Alabama's historic common law reasonableness standard, applied strictly, through a reinvigoration of the protective factors that prompt judicial remittitur orders.

II. The Origin of the Problem

A
Before its decision in this case, the Supreme Court had never overturned a state court's award of punitive damages as violating federal due process requirements. The apparent reason for this is that state law reasonableness standards for determining the amount of the award had historically been stricter than the federal excessiveness standard. See Haslip, 499 U.S. at 16-18, 111 S.Ct. at 1043 ("So far as we have been able to determine, every state and federal court that has considered the question has ruled that the common-law method for assessing punitive damages does not in itself violate due process.... In view of this consistent history, we cannot say that the common-law method for assessing punitive damages is so inherently unfair as to deny due process ....") (citation omitted). As Justice Stevens noted in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993):
"[W]e do not suggest that a defendant has a substantive due process right to a correct determination of the `reasonableness' of a punitive damages award.... [S]tate law generally imposes a requirement that punitive damages be `reasonable.'... A violation of a state law `reasonableness' requirement would not, however, necessarily establish that the award is so `grossly excessive `as to violate the Federal Constitution. Furthermore, ... our cases have recognized for almost a century that the Due Process Clause of the Fourteenth Amendment imposes an outer limit on such an award...."
509 U.S. at 458 n.24, 113 S.Ct. at 2720-21 n.24 (emphasis added). Thus, application of the stricter state law reasonableness standard has traditionally kept awards of punitive damages from exceeding the more liberal "outer limit" imposed by the federal excessiveness standard.

B
The state law reasonableness standard derives from the judicial mechanism of remittitur, which plays an integral role in the procedure for respecting and controlling the jury's function to punish tortfeasors. Common law judges traditionally accorded jury awards of punitive damages a rebuttable presumption of correctness. See, e.g., Leith v. Pope, 2 Black. W. 1327, 1328, 96 Eng. Rep. 777, 778 (C.P.1779) ("[I]n cases of tort the Court will not interpose on account of the largeness of damages, unless they are so flagrantly excessive *520 as to afford an internal evidence of the prejudice and partiality of the jury"). At some point, however, when the facts indicated that the presumption of correctness waned and was finally overcome, common law judges used remittitur to reduce unreasonable awards that resulted from the passion or prejudice of the jury. Numerous English cases upheld the power of common law courts to order a new trial if the judges deemed the punitive damages unreasonable. See, e.g., Gilbert v. Burtenshaw, 1 Cowper 230, 98 Eng. Rep. 1059 (K.B.1774) (Mansfield, J.) (recognizing judicial power to grant new trial when jury awards of damages are excessive).[10]
American courts adopted the same procedure. In Whipple v. Cumberland Mfg. Co., 29 F. Cas. 934, 937-38 (C.C.Me.1843), Justice Story, sitting as a Circuit Justice, acknowledged the judicial duty to set aside a jury verdict for unreasonable damages. He had previously stated the American doctrine as follows:
"As to the question of excessive damages, I agree, that the court may grant a new trial for excessive damages.... It is indeed an exercise of discretion full of delicacy and difficulty. But if it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case."
Blunt v. Little, 3 F. Cas. 760, 761-62 (C.C.Mass.1822) (Story, J., sitting as Circuit Justice).
In National Surety Co. v. Mabry, 139 Ala. 217, 225, 35 So. 698, 701 (1903), this Court recognized the judicial duty to reduce unreasonable awards of punitive damages, by citing with approval Lord Mansfield's opinion in Gilbert, supra, and Justice Story's opinion in Whipple, supra. See, e.g., Cook & Laurie Contracting Co. v. Bell, 177 Ala. 618, 635, 59 So. 273, 279 (1912) ("Remittiturs are favored by the courts in proper cases, for the promotion of justice and the ending of litigation") (quoting Richardson v. Birmingham Cotton Mfg. Co., 116 Ala. 381, 22 So. 478 (1897)); Airheart v. Green, 267 Ala. 689, 692-93, 104 So.2d 687 (1958) (affirming trial court's order of remittitur of damages).
In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), this Court established standards for trial judges to apply in granting or denying new trial motions on the grounds of excessiveness of punitive damages and for appellate courts to use in reviewing the trial judges' actions.

C
We recognized in Green Oil, 539 So.2d at 222-24, that the excessiveness review measures when the rebuttable presumption of correctness for jury awards of punitive damages wanes and is finally overcome. Accordingly, Green Oil provided both punitive factors and protective factors. The Green Oil punitive factors include: (1) removing the profit that the tortfeasor gained from his wrongful conduct; (2) providing a penalty that is sufficiently large to "sting" the tortfeasor, given his financial position; and (3) considering the reasonable costs of litigation. Id. at 223. The Green Oil protective factors include: (1) ensuring a reasonable relationship between the size of the punitive damages award and the actual or likely harm resulting from the tortfeasor's wrongful conduct; (2) allowing only truly reprehensible conduct to justify sizable punitive damages awards; (3) ensuring that the punitive damages award does not devastate the tortfeasor, given his financial position; and (4) reducing the punitive damages award by any civil or criminal penalties imposed on the tortfeasor for the same conduct. Id. at 223-24. The difference between the Supreme Court's decision in this case and its decision in Haslip, supra, then, can be explained by looking to *521 the rigor of this Court's application of the protective Green Oil factors.[11] This Court's less stringent application of these factors in this case put our state law in conflict with the Supreme Court's application of the three federal due process guideposts.[12]

III. The State Law Solution
To resolve the present conflict between the state law reasonableness standard and the federal law excessiveness standard, I would return to the traditional, restrictive Alabama reasonableness standard. Although the Supreme Court, and thus, this Court, cannot precisely define the "outer limit" of federal due process, 517 U.S. at___, 116 S.Ct. at 1602 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula"), we can more precisely define the "inner boundary" of state law reasonableness, Hammond, 493 So.2d at 1378 ("[T]he responsibility to adopt standards [for requiring remittitur] lies with this Court"). To the extent this definition comports with history by producing a common law reasonableness standard that is stricter than the federal law excessiveness standard, it would both avoid conflict with binding Supreme Court precedent and provide a more workable standard for Alabama courts to apply. Specifically, I would reinvigorate the following protective Green Oil factors:
Ratio of Punitive Damages to Compensatory DamagesAlthough the Supreme Court rejected any fixed ratio, it recognized that punitive damages "must bear a `reasonable relationship' to compensatory damages." 517 U.S. at ___, 116 S.Ct. at 1601-02. I agree with the majority that this Court should not adopt a specific ratio as a judicially imposed cap on punitive damages. At the same time, I recognize that of the protective Green Oil factors, the ratio of punitive damages to compensatory damages provides the most practical guideline for Alabama trial judges.[13] Both the Alabama Legislature and Congress have established treble damages as the most common punitive standard.[14] I would therefore adopt that three-to-one ratio, *522 not as any kind of rigid restraint, but to serve as a benchmark against which to measure reasonableness. Significant deviations above the three-to-one benchmark should require special justification.
Reprehensibility of the ConductThe Supreme Court stated that the degree of reprehensibility of the defendant's conduct was "[p]erhaps the most important" guidepost for assessing whether a punitive damages award is excessive. 517 U.S. at ___, 116 S.Ct. at 1599. To justify a sizable punitive damages award, the Supreme Court requires evidence of "indifference to or reckless disregard for the health and safety of others," as opposed to mere economic harm. Id. For purely economic harm to justify a substantial award, it must be coupled with intentional, "affirmative acts of misconduct, ... financially vulnerable [victims,] ... [or] prohibited conduct [engaged in] while knowing or suspecting that it was unlawful." Id.
To justify a punitive damages award of greater than three times compensatory damages, I would define the Green Oil factor of reprehensibility to require: (1) endangerment of the physical health and safety of others; or (2) economic harm resulting from an intentional misrepresentation, deceit, or concealment of a material fact, as set out in Ala.Code 1975, § 6-11-20(b)(1), coupled with either (a) conduct repeated in spite of prior punishment, or (b) a substantial number of similar misrepresentations or acts of concealment.[15]
Similar Civil and Criminal Sanctions The Supreme Court stated that in assessing the size of a punitive damages award, a court should "accord substantial deference" to statutory fines or civil or criminal sanctions for comparable misconduct. 517 U.S. at ___, 116 S.Ct. at 1603. The Supreme Court also noted that a statutory fine could be multiplied by the number of wrongful acts for comparison to the punitive damages award. 517 U.S. at ___, 116 S.Ct. at 1603.
I would define the Green Oil factor of comparable civil and criminal sanctions to require comparison of the punitive damages award to civil or criminal penalties for similar misconduct, if such penalties exist.[16] To justify an award of greater than three times compensatory damages, the comparable civil or criminal penalties must involve substantial monetary fines or imprisonment.
The vigilant and consistent application of these Green Oil factors to the specific facts of each case would, I believe, eliminate the danger that Alabama punitive damages awards will transgress the "outer limit" imposed on those awards by federal due process requirements.

IV. Application of Green Oil to the Facts of this Case

If this were the majority opinion, I would remand to allow the trial judge to apply the revised standard, because the trial judge should have the first opportunity to order remittitur of an excessive award to a constitutionally permissible amount.[17] However, *523 because the majority has chosen not to do that, I will address the majority's conclusion that $50,000 in punitive damages is the maximum amount that can be awarded under the facts of this case.
I note, initially, that the $2,000,000 in punitive damages originally approved by this Court greatly exceeds the amount that would be three times the compensatory damages (3 x× $4,000 = $12,000). Because of the jury's significant deviation above the three-to-one benchmark discussed earlier, I look to the record for the special justification that, I believe, is necessary to uphold a punitive damages award in excess of three times the compensatory damages award. In this regard, I note that BMW's conduct did not endanger the physical health or safety of the plaintiff or of others. BMW's policy of selling new vehicles without disclosing that it had refinished them resulted in purely economic harm to the purchasers. Furthermore, at the time of BMW's nondisclosure in this case, the Legislature had not signaled that significant punishment was due in cases such as this one, imposing only a $2,000 civil penalty for each willful violation of the Deceptive Trade Practices Act. See Ala.Code 1975, § 8-19-11. After this action was filed, the Legislature, during its 1993 Regular Session, enacted Act No. 93-203, Ala. Acts 1993 (now codified at Ala.Code 1975, § 8-19-5), to require manufacturers to disclose those repairs costing more than the greater of $500 or 3% of the manufacturer's suggested retail price. Consequently, because the cost of refinishing the plaintiff's vehicle was less than 3% of the manufacturer's suggested retail price, the conduct for which BMW is being punished would not even be tortious if it occurred today. Although BMW's policy of nondisclosure was, in my view, reprehensible enough to justify the imposition of some punitive damages, I am persuaded now that the considerations mentioned abovethe purely economic harm caused by BMW's conduct, the lack of a substantial monetary fine or term of imprisonment for that conduct, and the current legislative policy of allowing manufacturers to make certain minor repairs without disclosuremilitate against a punitive damages award in excess of three times the compensatory damages and certainly against one 500 times the compensatory damages. However, other considerations persuade me that a $12,000 punitive damages awardi.e., an amount three times the compensatory damages awardwould not suffice in this case. Of primary significance is the evidence indicating that BMW sold at least 12 refinished vehicles in Alabama, in addition to the one that it sold to the plaintiff, and that those sales were fraudulent or wrongful under the law at that time.[18] After considering this pattern or practice of nondisclosure, as well as the reasonable costs associated with the plaintiff's prosecution of this action, I agree with the majority that $50,000 is a constitutionally permissible amount under the facts of this case.
For the reasons stated above, I concur in the result.
HOOPER, C.J., and MADDOX, J., concur.
SEE, Justice (recusing).
The United States Supreme Court's decision in BMW of North America, Inc. v. Gore, 517 U.S. 1589, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), has been the topic of a national debate.[19] It is not surprising that the BMW case intruded into my 1996 campaign for this office. During the campaign, I restricted my comments on this case to the published opinions of this Court and the United States *524 Supreme Court.[20] Nonetheless, because of the high profile of the BMW case, and because of its prominent role during the campaign, I believe it is in the best interests of this Court that I recuse myself from this case.
At the first conference of the Justices after I took office, I announced to the Court that I would recuse myself from BMW, and I have ever since refrained from any discussion of the facts of BMW or of the appropriate outcome in this case. I have, of course, participated fully with my fellow Justices in the discussion of Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685 (Ala.1996), American Pioneer Life Ins. Co. v. Williamson, 681 So.2d 1040 (Ala.1995), Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995), and Union Security Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala.1995), which were remanded to this Court for reconsideration in light of the United States Supreme Court's opinion in BMW. The other Justices have, therefore, had the full benefit of my views and my analysis as they relate to the issue of punitive damages presented in each of those cases.
NOTES
[1] Chief Justice Hooper and Justices Cook, Butts, and See were not members of this Court when that opinion was released. Justice Almon was a member of the Court at that time, but did not participate in the decision.
[2] This Court reversed the judgment as to defendant Bayerische Motoren Werke, A.G., holding that it did not have sufficient contacts with Alabama to be subject to personal jurisdiction in this state. BMW, 646 So.2d at 622.
[3] The United States Supreme Court also remanded these four cases for reconsideration along with BMW: Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685 (Ala.1996); Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995); Union Security Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala.1995); and American Pioneer Life Ins. Co. v. Williamson, 681 So.2d 1040 (Ala.1995).
[4] Out of the more than 100 published opinions dealing with punitive damages since 1989, when the Green Oil review was implemented, fewer than 10% have affirmed punitive damages awards that still exceeded $2 million after appellate review. In several of those cases where the punitive damages award affirmed exceeded $2million, the large amount of the compensatory damages awards indicated a level of misconduct that would clearly justify an unusually high punitive damages award. See Duck Head Apparel Co. v. Hoots, 659 So.2d 897 (Ala.1995) ($4,350,000 compensatory damages and $15,000,000 punitive damages); Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.1993), cert. denied, 511 U.S. 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994) ($850,000 compensatory damages and $2.5 million punitive damages). In approximately 50% of the published opinions, the punitive damages award affirmed was $100,000 or less, and in approximately 80% the punitive damages award affirmed was $1 million or less.
[*] Note from the reporter of decisions: The Supreme Court on September 10, 1997, entered a "certificate of judgment of affirmance," noting that "the appellee, Ira Gore, Jr., did on September 3, 1997, file in this Court an acceptance of remittitur of punitive damages to the amount of $50,000." The certificate ordered "that the judgment of the circuit court for punitive damages be reduced to the sum of $50,000 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs."
[**] Chief Justice Hooper and Justices Cook, Butts, and See were not members of this Court when the original opinion in this case was released.
[***] Justice Almon was a member of this Court when the original opinion in this case was released, but he did not participate in that decision.
[5] The number of Alabama sales referred to here excluded, apparently, the one to Dr. Thomas Yates, which sale was the subject of the action in Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App.1993), writ quashed, 642 So.2d 937 (Ala.1993). In that case, a jury awarded Dr. Yates $4,600 in compensatory damages, and $0 in punitive damages. 642 So.2d at 938. See BMW of North America, Inc. v. Gore, 517 U.S. 559, ___n. 9, 116 S.Ct. 1589, 1594 n. 9, 134 L.Ed.2d 809 (1996).
[6] Justice Maddox, with Justice Steagall joining, concurred in the result reached in Aetna on remand, and I concurred specially and set out a procedure that I considered would be a "principled approach" to the problem. 505 So.2d at 1054-62.
[7] In Haslip the plaintiff paid premiums for hospital insurance coverage that she did not have because the insurance agent had misappropriated Haslip's premiums. After receiving a lapse notice for failure to pay the premiums, the insurance agent failed to forward the lapse notice to Haslip. Haslip discovered that she had no hospital insurance after she was hospitalized and her hospital bill was not paid by the insurance company.

On March 8, 1991, four days after Haslip was released, portions of the 1987 legislation dealing with punitive damages were declared unconstitutional by this Court. Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991); other sections of the 1987 legislation dealing with punitive damages were declared unconstitutional subsequent to that, with the most significant being the $250,000 cap on punitive damages, which was declared to be unconstitutional by a divided court in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), even though the Supreme Court of the United States in Haslip had noted the following about that statutory cap:
"The Alabama Legislature recently enacted a statute that places a $250,000 limit on punitive damages in most cases. See 1987 Ala. Acts, No. 87-185, §§ 1, 2, and 4. The legislation, however, became effective only on June 11, 1987, see § 12, after the cause of action in the present case arose and the complaint was filed."
499 U.S. at 20 n. 9, 111 S.Ct. at 1044 n.9.
Between March 4, 1991, when the opinion upholding the punitive damages award in excess of $800,000 in Haslip was released, and May 20, 1996, when an opinion vacating and reversing the $2,000,000 punitive damages award in the present case was released, the Supreme Court of Alabama had declared substantial portions of the 1987 legislation on punitive damages to be unconstitutional and had upheld punitive damages awards in non-wrongful death and nonphysical injury cases of $15,000,000, Duck Head Apparel Co. v. Hoots, 659 So.2d 897 (Ala.1995); $12,463,624, Northwestern Mutual Life Ins. Co. v. Sheridan, 630 So.2d 384 (Ala.1993); $6,000,000, Union Mortgage Co. v. Barlow, 595 So.2d 1335 (Ala.1992), cert. denied, 506 U.S. 906, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992); $6,000,000, Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995), judgment vacated, ___ U.S. ___, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996); $5,000,000, Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685 (Ala.1996), judgment vacated,___ U.S. ___, 117 S.Ct. 288, 136 L.Ed.2d 207 (1996); $4,000,000, Independent Life & Accident Ins. Co. v. Harrington, 658 So.2d 892 (Ala.1994), cert. dismissed, ___ U.S. ___, 116 S.Ct. 1587, 134 L.Ed.2d 662 (1996); $2,500,000, Benetton S.p.A. v. Benedot, Inc., 642 So.2d 394 (Ala.1994); $2,000,000, Union Security Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala. 1995), judgment vacated, ___ U.S. ___, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996); $2,000,000, Crown Life Ins. Co. v. Smith, 657 So.2d 821 (Ala.1994); $2,000,000, American Pioneer Life Insurance Co. v. Williamson, 681 So.2d 1040 (Ala. 1995), judgment vacated, ___ U.S. ___, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996); $1,975,000, Allstate Insurance Co. v. Hilley, 595 So.2d 873 (Ala. 1992); $1,000,000, Liberty National Life Ins. Co. v. McAllister, 675 So.2d 1292 (Ala.1995), cert. dismissed, ___ U.S. ___, 116 S.Ct. 688, 133 L.Ed.2d 593 (1995); $1,000,000, Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994); $1,000,000, Intercontinental Life Ins. Co. v. Lindblom, 598 So.2d 886 (Ala.1992), cert. denied, 506 U.S. 869, 113 S.Ct. 200, 121 L.Ed.2d 142 (1992); $1,000,000, Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878 (Ala.1991); $1,000,000, Mannington Wood Floors, Inc. v. Port Epes Transport, Inc., 669 So.2d 817 (Ala.1995).
[8] The Supreme Court has expressly stated that the federal excessiveness standard cannot be defined by a formula or bright line. BMW, 517 U.S. at ___, 116 S.Ct. at 1602 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula"); Haslip, 499 U.S. at 18, 111 S.Ct. at 1043 ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case").
[9] See, e.g., Pierce O'Donnell, Justice Byron White: Leading from the Center, 72 A.B.A.J. 24, 26-27 (applauding Justice White's consistent advocacy of appellate rules that are "practical and intelligible").
[10] See also Jones v. Sparrow, 5 T.R. 257, 101 Eng. Rep. 144 (K.B.1793) (new trial granted for excessive damages); Hewlett v. Cruchley, 5 Taunt. 277, 281, 128 Eng. Rep. 696, 698 (C.P. 1813) ("[I]t is now well acknowledged in all the Courts of Westminster-hall, that whether in actions for criminal conversation, malicious prosecutions, words, or any other matter, if the damages are clearly too large, the Courts will send the inquiry to another jury.") (emphasis in original).
[11] In his opinion in this case, 517 U.S. at ___, 116 S.Ct. at 1606, Justice Breyer, speaking for three members of the five-member majority, criticized this Court's application of the Green Oil factors.
[12] I note that the three due process guideposts (i.e., reprehensibility of the wrongful conduct, ratio of punitive damages to compensatory damages, and comparable civil and criminal penalties) are similar to the three protective Green Oil factors (i.e., reprehensibility of the wrongful conduct, reasonable relationship of the size of the punitive award to the actual and probable harm, and mitigation for actual civil and criminal penalties imposed). This is because the guideposts and the protective Green Oil factors protect similar interests. The three guideposts protect the defendant's due process right to receive fair notice of the severity of potential penalties against him, 517 U.S. at ___, 116 S.Ct. at 1598, and the three Green Oil factors protect the defendant from unreasonable punitive awards imposed by an impassioned or prejudiced jury, Green Oil, 539 So.2d at 222.
[13] The principle that punitive damages should bear a reasonable relationship to compensatory damages has roots going back to the early English statutes that provided for punitive damages equal to a multiple of actual damages. See David G. Owen, A Punitive Damages Overview: Functions, Problems and Reform, 39 Vill. L.Rev. 363, 368 & n. 23 (1994). Alabama courts have consistently upheld the reasonable relationship principle. See Mobile & Montgomery R.R. v. Ashcraft, 48 Ala. 15, 33 (1872) ("punitive damages ought ... to bear proportion to the actual damages sustained"). (Emphasis added.) Such authorities plainly suggest that a reasonable ratio between punitive damages and actual damages is a hallmark of common law reasonableness.
[14] Ala.Code 1975, § 8-19-10(a)(2) (providing for treble damages for certain violations of the Deceptive Trade Practices Act); § 37-2-18 (providing treble damages for certain harm caused by common carriers); § 10-2B-15.02 (levying a penalty "equal to treble the amount of all fees and taxes" on foreign corporations that fail to obtain a certificate of authority); 18 U.S.C. § 1964(c) (providing for treble damages for civil violations of the Racketeer Influenced and Corrupt Organizations Act); 15 U.S.C. § 15 (providing for treble damages for violations of the Sherman Act's prohibition on monopolistic practices).

I also note that the use of a multiple of compensatory damages as a penalty has ancient and biblical origins. The ancient law of Rome required restitution of four times the amount wrongfully taken. VIII The Interpreter's Bible 326 (1952). Jewish law provided: "If a man shall steal ... a sheep, and kill it, or sell it; he shall restore ... four sheep for a sheep." Exodus 22:1. Zacchaeus promised: "`[I]f I have defrauded any one of anything, I restore it fourfold,'" which was acceptable. Luke 19:1-10. The new Oxford Annotated Bible with the Apocrypha, Expanded Edition (1977), pages 1273-74. These laws provide for the return of the amount wrongfully taken plus three times the amount wrongfully taken.
[15] I would require further indicia of egregious conduct to justify a sizable punitive award when physical safety or health is not endangered. In Green Oil, 539 So.2d at 223, this Court stated:

"The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or `cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility."
[16] In Green Oil, 539 So.2d at 223-24, this Court stated:

"If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
"....
"... If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award." (Quoting Aetna, 505 So.2d at 1062.)
[17] In Hammond, 493 So.2d at 1379, this Court required "trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." I reiterate the necessity for trial courts to examine with specificity each of the Green Oil factors in light of the evidence at trial and to indicate in the record how the final punitive damages award was determined.
[18] The evidence actually indicated that BMW sold at least 14 vehicles in Alabama; however, in Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App.1993), cert. quashed, 642 So.2d 937 (Ala.1993), the jury, under similar facts, awarded the plaintiff compensatory damages but no punitive damages. It would be inappropriate, in my opinion, to use the sale made the subject of the Yates case to enhance the punishment in the present case.
[19] See, e.g., Paul M. Barrett, Justices Reject BMW Penalty as "Excessive", Wall St. J., May 21, 1996, at A3; Tony Mauro, Court to Weigh Punitive DamagesBMW Case Tests Legal "Wild Card", USA Today, Oct. 11, 1995, at 03A; Kelley Holland, Punishing Punitive Damages, Bus. Wk., June 3, 1996, at 46; Peter Huber, Fleeing Alabama, Forbes, July 15, 1996, at 92.
[20] This Court's opinion was reported as BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala. 1994). The United States Supreme Court's opinion which vacated this Court's judgment and remanded the case to this Court for further proceedings, was reported as BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1995).