709 So.2d 1118 (1997)
UNION SECURITY LIFE INSURANCE COMPANY
v.
Evelyn CROCKER.
1931672.
Supreme Court of Alabama.
August 15, 1997.
Rehearing Overruled November 21, 1997.
*1119 Broox G. Holmes, James E. Robertson, Jr., and Rodney R. Cate of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile; John W. Thompson II of Thompson & Thompson, Butler; and Andrew L. Frey and Evan M. Tager of Mayer, Brown & Platt, Washington, DC, for appellant (on remand and on rehearing following remand).
Larry W. Morris, Alexander City, and William L. Utsey, Butler, for appellee (on remand).
No brief filed for appellee (on rehearing following remand).

On Remand from the United States Supreme Court
BUTTS, Justice.
The Supreme Court of the United States has vacated our judgment in this case and has remanded the case for our further consideration in light of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).
In BMW, Dr. Ira Gore sued BMW of North America for damages for fraud, based upon BMW's failure to disclose that it had made presale repairs to an automobile it sold to him as new. The jury awarded Gore $4,000 in compensatory damages and $4 million in punitive damages; this Court reduced the punitive award to $2 million. See BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994). The Supreme Court determined that the $2 million punitive damages award was "grossly excessive," particularly in relation to the compensatory damages award, and violated the Due Process Clause of the Fourteenth Amendment. 517 U.S. at 575, 116 S.Ct. at 1599. The Supreme Court then remanded the BMW case, as well as this present case, for this Court to reconsider in each the punitive damages award.

I.
We begin with this statement of the pertinent facts, as they are set out in our original opinion in this case, Union Sec. Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala.1995):
"Union Security ... sells credit life insurance through lending institutions nationwide, including [First Alabama Bank of Choctaw]. Various First Alabama loan officers are contractually authorized in this state to take applications for credit life insurance from their customers and to issue certifications of insurance for approved applications, showing that the coverage is in effect.
"Union Security requires that, for credit life policies issued in conjunction with First Alabama loans in excess of $10,000, the customer execute a `Statement of Debtor's Physical Condition' before credit life coverage is issued. This health disclosure statement authorizes Union Security to receive any information related to the health ... of the applicant, as long as this information is for the purpose of evaluating or underwriting the application for credit life coverage.
"The health disclosure statement has nine boxes to be checked `yes' or `no' in response to specific questions concerning the applicant's medical history. [Before it will issue coverage to an applicant,] Union Security requires that all of these boxes be checked `no,' indicating that the applicant has had no prior ... illnesses [or poor health conditions].... Union Security [reserves] the right to examine applicants' health records to determine `after the fact' whether coverage should have been issued. Union Security does not issue a written policy to those applicants who are accepted for coverage.
"In October 1990, Union Security was selling credit life insurance in conjunction with loans made by First Alabama in Choctaw County, Alabama. Union Security authorized Sammy Taylor, a First Alabama branch manager in Choctaw County, as its agent to offer the coverage to loan applicants, and it paid him a commission of the premiums on the credit life policies that it issued pursuant to the applications he obtained.
"[Evelyn and Coleman Crocker] knew Taylor and contacted him at the bank to *1120 inquire about obtaining a consolidation loan. Taylor advised Mrs. Crocker to pick up an application from the bank and complete it; [the Crockers] picked up one and then they met with Taylor. During this meeting, Taylor completed a separate health disclosure statement for each of the Crockers. He had premarked each of the nine health questions on the statements by checking the `no' boxes, indicating that neither of the Crockers suffered from any past illnesses. Mr. Crocker, however, had been suffering from Parkinson's disease for some years and had also undergone serious heart surgery twice within the last 10 years. The Crockers signed the respective health disclosure statements that Taylor had prepared for them.
"....
"... There was ... evidence that Taylor and his wife had vacationed with the Crockers and that they had visited them in their home during the years that Mr. Crocker suffered from heart disease and Parkinson's disease. In spite of this, Taylor nevertheless indicated on the health disclosure statement that the Crockers were in good health and had no history of illness; doing so enabled him to issue the insurance policy on them and collect the commission from the policy for himself."
667 So.2d at 691-92.
Mr. Crocker died from heart disease in August 1991; Mrs. Crocker submitted a death certificate to Union Security and attempted to collect the credit life benefits. Union Security investigated the claim and denied coverage, based on Mr. Crocker's history of heart disease. Without her husband's income, and without the benefits of the coverage for which she had paid premiums, Mrs. Crocker was unable to pay off the balance on her First Alabama loan. On December 11, 1991, Taylor wrote Mrs. Crocker to inform her that, because of her default on the loan, First Alabama would foreclose the mortgage on her double-wide mobile home, which was the collateral for the loan. The foreclosure was to take place on December 20, 1991, five days before the first Christmas that Mrs. Crocker would spend as a widow. The foreclosure proceedings were halted only after Mrs. Crocker obtained legal counsel. Mrs. Crocker subsequently brought this fraud action against Union Security, Taylor, and First Alabama.

II.
With these facts in mind, we will now apply the three "guideposts" set out by the United States Supreme Court in BMW v. Gore, which are intended to gauge whether Union Security had received adequate notice that misconduct such as that committed in this case could lead to a $2 million punitive damages award.

A. The Reprehensibility of Union Security's Misconduct

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575, 116 S.Ct. at 1599. Although the Supreme Court in BMW did not provide any particular yardstick by which to measure reprehensibility, it did acknowledge that "`trickery and deceit' ... are more reprehensible than negligence" and that acts of affirmative misconduct, such as making deliberate false statements, are more reprehensible that an innocent misrepresentation. 517 U.S. at 576,116 S.Ct. at 1599. Likewise, this Court has stated that in determining the reprehensibility of a defendant's conduct the reviewing court may consider "`[the] duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil Co. v. Hornsby, 539 So.2d 218, 223 (Ala.1989), quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987).
The evidence shows that the Crockers could not obtain the First Alabama loan they needed unless they also obtained credit life insurance from Union Security. Sammy Taylor, acting as Union Security's agent, knew that applicants for credit life insurance who revealed previous or existing health problems on the health disclosure statement contained in the application would not qualify *1121 for the coverage. There was evidence that Taylor was a friend of Mr. Crocker, that he and his wife had vacationed with the Crockers, and that they had visited the Crockers during the time that Mr. Crocker suffered from both Parkinson's disease and heart disease. There is evidence that Taylor knew that these health conditions existed when Mr. Crocker and his wife applied to him for credit life insurance in conjunction with this home equity loan. Taylor knew that he would receive a commission from the sale of credit life insurance to Mr. Crocker, even if a future claim for the benefits was denied.
With this knowledge, Taylor deliberately precompleted for the Crockers the health disclosure statement on the Crockers' application form, marking "No" beside questions that asked if Mr. Crocker suffered from heart disease or certain other illnesses. Taylor thus intentionally falsified information on the Crockers' life insurance application, to secure a fraudulent approval by Union Security. He did so knowing that the Crockers were relying on the coverage to pay off the loan and to prevent the foreclosure of their home mortgage in the event either of them died. He assured them they would receive coverage, and he collected his commission when they did, knowing that their benefits would be denied if his false representations on their applications were discovered after the fact.
Union Security issued insurance to Mr. Crocker without any meaningful knowledge of his medical history, and it collected premiums from him until he died on August 28, 1991. When Mrs. Crocker, newly widowed, submitted her claim for benefits under the policy, Union Security denied it, leaving her with no means to pay her debt to First Alabama. She was threatened with foreclosure of her home mortgage, only five days before the first Christmas that she would spend without her husband after 31 years of marriage.
Given these facts, we agree that the gravity of Union Security's misconduct is a factor that would support a considerable punitive damages award. However, we must also recognize that Union Security's misconduct appears to have been an isolated incident, rather than the result of a standard operating procedure. The evidence shows that in 1991 Union Security received 134 claims for payment on credit life insurance issued through First Alabama, and that Mrs. Crocker's claim was the only one it denied. In 1992, Union Security received 119 claims for payment and denied only two; both were denied because the insureds had committed suicide and the policies had suicide-exclusion clauses. In 1993, Union Security received 113 claims and denied only four of them. Thus, during the period 1991-1993, Union Security's denial rate on credit life claims was less than 1% and most of the denials were based upon an insured's having committed suicide. The evidence thus indicates that, while Union Security's misconduct in this case was highly reprehensible, it was also an aberration for the company.

B. The Ratio of Punitive Damages to Compensatory Damages

According to the United States Supreme Court in BMW, a second factor to be considered in determining whether an award of punitive damages is excessive is the ratio of punitive damages to the actual harm inflicted upon the plaintiff. Because the jury awarded general damages in this case, we cannot determine with certainty the ratio of punitive damages to compensatory damages. Certainly we do not consider the compensatory damages award to be based solely upon economic loss, as Justice See suggests in his dissent. Rather, we have thoroughly reviewed the compelling evidence of Mrs. Crocker's emotional and mental distress over Union Security's misconduct, as well as her economic loss, in determining the possible ratio of punitive damages to compensatory damages.
The evidence shows that Mrs. Crocker suffered as much as $16,222.61 in actual economic loss, representing not only the $1,659.61 that Mrs. Crocker and her husband paid for the credit life insurance, but also the $14,563 outstanding balance on the loan, which the insurance policy was to have paid. It is important to recognize that this economic injury was catastrophic for Mrs. Crocker in the wake of her husband's death; without *1122 his income to help make the loan payments to First Alabama, those benefits were all she had to keep from losing her home to foreclosure.
The United States Supreme Court in BMW held that an economic loss to the plaintiff in that case, a well-to-do medical doctor, did not support a large punitive damages award; however, the Supreme Court was careful to point out that economic injury inflicted upon the "financially vulnerable" is an entirely different concern and "can warrant a substantial penalty." 517 U.S. at 576, 116 S.Ct. at 1599. Where, as here, the economic harm could devastate its target, this is an especially serious consideration to be weighed against the amount of damages awarded. The Supreme Court also recognized in BMW that "[a] higher ratio [of punitive damages to compensatory damages] may... be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm [is] difficult to determine." 517 U.S. at 582, 116 S.Ct. at 1602.
Likewise, in the recent case of First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala.1997), this Court emphasized: "There is no fixed standard for ascertaining the amount of compensatory damages that may be awarded for emotional distress. The determination of how much to award is left to the sound discretion of the jury, subject only to review by the court for a clear abuse of that discretion." 694 So.2d at 1326. In Spivey, this Court upheld the jury's award of $1 million in damages, $500,000 of which was compensatory damages awarded largely on the basis of the plaintiff's evidence of mental and emotional distress arising from the defendant's fraudulent conduct that led to the foreclosure of the mortgage on the plaintiff's home.
Aside from the economic loss the evidence suggests, there is the unknowable amount of compensation the jury could have awarded to Mrs. Crocker based upon the emotional and mental toll the wrongful conduct took upon her; that conduct led to her fight over insurance and caused her to face the threat of losing her home in foreclosure proceedings only months after losing her husband. Based on this evidence, we cannot conclude that the possible ratio of punitive damages to compensatory damages in this case would indicate excessiveness.

C. Civil Penalties for Comparable Misconduct

A third factor we must consider in determining whether the punitive damages award was excessive is the relationship of the punitive damages award to the civil or criminal penalties that could be imposed for comparable misconduct. BMW, 517 U.S. at 583, 116 S.Ct. at 1603. In BMW, the Supreme Court questioned whether the Alabama Deceptive Trade Practices Act, which imposes a maximum penalty of $2,000 for a violation, was adequate to provide BMW with notice of the severity of the punishment that would result from its deceptive practice. 517 U.S. at 584, 116 S.Ct. at 1603. However, as this Court stated in its opinion upon remand in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW II"), the maximum statutory sanction against insurance fraud in this state is meager and, "[b]ecause the legislature has set the statutory penalty for deceitful conduct at such a low level, there is little basis for comparing it with any meaningful punitive damages award." 701 So.2d at 514.

III.
As we determined in BMW II, the United States Supreme Court's "due process" guideposts are not intended to exclude judicial consideration of the factors of review already established by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). We will now reconsider those factors as they apply in this case.

A. Union Security's Profit from its Misconduct

In a Hammond-Green Oil review, we are required to determine whether, if the wrongful conduct was profitable to the defendant, the punitive damages award removes the profit and is in excess of the profit, so that the defendant recognizes a loss. Green Oil, 539 So.2d at 223. It is undisputed that Union Security and Taylor made a profit from *1123 the sale of credit life insurance to the Crockers. Taylor testified that he received an annual commission of $600-$800 from selling credit life insurance for Union Security through First Alabama. There was evidence that Union Security earned $67,019 from selling credit life insurance through First Alabama in 1991. Clearly, the punitive damages award removes this profit and so exceeds it that Union Security will recognize a significant loss.

B. Union Security's Financial Position

In determining whether the punitive damages award was excessive, we must next consider Union Security's financial position. In 1993, when the jury awarded the damages in this case, Union Security had a net worth of $24,340,000. Out of that sum, Union Security had an unassigned surplus of approximately $15,000,000, from which it would pay the punitive damages award. Thus, the $2 million in punitive damages would remove 8.2% of Union Security's net worth and 13% of its available surplus. As we stated in BMW II, if a punitive damages award exceeds 10% of the defendant's net worth, that fact might, under certain circumstances, indicate that the punitive damages award has gone beyond reasonable punishment and is excessive, BMW II, 701 So.2d at 514. The punitive damages award in this case is close to that range, and we agree that it would be excessive for misconduct that, while reprehensible, was isolated.

C. The Costs of Litigation

In a Green Oil review, the court should consider whether the punitive damages award was sufficient to reward the plaintiff's lawyer for assuming the risk of bringing the lawsuit and to encourage other victims of wrongdoing to come forward. In its Green Oil review of this case, the trial court determined that the plaintiff's attorneys had spent approximately $35,000 in prosecuting this claim. Although the plaintiff's attorneys have since incurred additional expenses in defending the verdict and the punitive damages award on appeal before this Court and before the United States Supreme Court, the $2 million award is well out of proportion to these expenses.

D. Criminal Sanctions

A Hammond-Green Oil review requires us to consider whether criminal sanctions have been imposed on Union Security for its conduct. There were no such sanctions.

E. Other Civil Actions

The record does not indicate that other civil actions have been filed based on the same misconduct by Union Security that is present in this case.

IV. Conclusion

We have carefully reconsidered this case in view of the United States Supreme Court's ruling in BMW v. Gore, and we have conducted a second Hammond-Green Oil review. We find that Union Security's misconduct was highly reprehensible and that it caused Mrs. Crocker mental and emotional distress, as well as serious economic harm. However, the evidence indicates that this misconduct was an aberration for Union Security and that the $2 million award would take away a considerable percentage of Union Security's net worth as punishment for it. Based upon all the factors of this review, and given the evidence, we conclude that the $2 million award was excessive and that an award of $1 million would be proper.
The trial court's judgment and its order denying Union Security's motion for a new trial are affirmed on the condition that the plaintiff file with this Court within 21 days a remittitur of damages in the amount of $1 million, thus reducing the award to $1 million; otherwise, the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.
ALMON, SHORES, HOUSTON, KENNEDY, and COOK, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
HOOPER, Chief Justice (dissenting).
I must respectfully dissent. It is clear from the record and this Court's earlier opinion *1124 in this case that the primary tortfeasor was First Alabama Bank. As this Court noted in its first opinion in this case, First Alabama has entered into a $1 million settlement with Mrs. Crocker. Union Security Life Insurance Co. v. Crocker, 667 So.2d 688, 690 (Ala.1995). I find no evidence of reprehensible conduct on the part of Union Security that would justify a substantial punitive damages award against it. Consequently, I conclude that the $2 million damages award against Union Security was grossly excessive.
Because we do not know the amount of punitive damages awarded by the jury's general verdict, I agree with Justice See that the case should be remanded. However, if it were proper for this Court to reduce the amount of punitive damages at this stage, I believe that several factors from BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), mandate a substantial reduction of the damages awarded to Mrs. Crocker.
The Crockers' policy provided for a one-year contestability period.[1] Mr. Crocker died approximately nine months after the closing of the consolidation loan in connection with which he obtained credit life insurance. Thus, Union Security, after Mr. Crocker's death, properly investigated the answers provided on the application.
Sammy Taylor committed the wrongful conduct in this case. Taylor was the branch manager of the Gilbertown branch of First Alabama. Because there has been no finding that Union Security had knowledge of any fraudulent conduct on the part of its agent, Union Security's liability is entirely vicarious. The majority does not reduce the punitive damages award to an amount that appropriately reflects the wrongfulness of Union Security's conduct.
As the majority writes, the United States Supreme Court in BMW indicated that the first, and perhaps the most important, indicium of the reasonableness of a punitive damages award is the reprehensibility of the defendant's conduct. According to the majority, the reprehensibility of Union Security's conduct supports a substantial punitive damages award in this case. I disagree.
It is clear that Union Security is liable for the acts of Taylor, its Alabama insurance agent. See, e.g., Wofford v. Safeway Ins. Co. of Alabama, 624 So.2d 555 (Ala.1993). However, I do not believe that the full measure of Taylor's wrongful actions should be attributable to Union Security, at least not for the analysis under BMW. There is a noticeable lack of evidence from which one could conclude that Union Security supported Taylor's conduct, or, for that matter, that Union Security had any knowledge at all of Taylor's deception or of any previous misconduct by Taylor as an agent. In fact, the majority writes that the evidence indicates that any misconduct attributable to Union Security was an "aberration for the company." 709 So.2d at 1121. While I agree that Union Security is subject to liability for the acts of its agent, I do not agree that in examining a punitive damages award for excessiveness the principal's ratification or nonratification of the agent's misconduct is totally irrelevant.
As for the analysis under the third "guidepost" stated by the Supreme Court in BMW, the size of criminal and civil penalties for comparable misconduct, I find myself, once again, disagreeing with the majority. The majority writes that, because it finds the penalties for deceitful conduct in Alabama to be so meager, there is little basis for comparing the penalty with any punitive damages award. The most important consideration behind the analysis called for by this "guidepost" is the notice available to this defendant of what penalty might be imposed upon it for deceitful conduct. The fact that the penalty is meager argues in favor of a reduction in *1125 the punitive award. If the penalty is meager, then the defendant received less notice that it would be subject to such an extraordinary punitive damages award. On the basis of this portion of the BMW analysis alone, I would substantially reduce the damages award in this case.
This Court should remand this case for the trial court to determine which portion of the award was punitive and which portion was compensatory. I also believe that this Court has once again ignored the United States Supreme Court's admonition that grossly excessive punitive damage awards, such as that awarded in this case, violate the Due Process Clause of the Fourteenth Amendment.
SEE, Justice (dissenting).
The record in this case does not specify how much of the general award represents punitive damages and how much represents compensatory damages. It is therefore impossible to determine whether the punitive award is excessive. This case should be remanded for a determination of what portion of the general award is punitive. I, therefore, respectfully dissent.
Mr. and Mrs. Crocker borrowed money from First Alabama Bank. A First Alabama employee sold the Crockers a credit life insurance policy issued by Union Security Life Insurance Company ("Union Security") to insure payment of the loan. While acting in the capacity of an agent for Union Security, the First Alabama employee falsified answers on the credit life application.
Mr. Crocker died of heart disease less than a year later. Pursuant to the terms of the policy, Union Security investigated Mrs. Crocker's insurance claim and discovered that Mr. Crocker had had a history of heart disease that was not disclosed on the application form. Accordingly, Union Security denied payment. Mrs. Crocker, unable to pay, defaulted on the loan. First Alabama instituted foreclosure proceedings.
Mrs. Crocker sued Union Security, First Alabama, and the First Alabama employee. The jury awarded her a $5 million general verdict. The trial court reduced that award to $3 million. First Alabama settled for $1 million, leaving Union Security facing the $2 million balance. Union Security alone appealed. This Court affirmed the $2 million award. Union Sec. Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala.1995). The Supreme Court of the United States vacated this Court's judgment and remanded this case for reconsideration in light of BMW of North America, Inc. v. Gore, 517 U.S. 559,116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW"). Union Sec. Life Ins. Co. v. Crocker, 517 U.S. 1230, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996). In BMW, 517 U.S. at 575-587, 116 S.Ct. at 1599-1604, the Supreme Court established, for the first time, three guideposts for assessing whether a punitive award exceeds the outer limit of federal due process. These are: (1) the ratio of punitive damages to compensatory damages; (2) civil and criminal sanctions for comparable misconduct; and (3) the reprehensibility of the defendant's conduct.
First, the ratio of punitive damages to compensatory damages that the United States Supreme Court requires us to consider, BMW, 517 U.S. at 579-85, 116 S.Ct. at 1601-03, cannot be computed when both numbers that would compose the ratio are unknown. In this case, the general verdict specifies neither the amount of compensatory damages nor the amount of punitive damages; thus, it is impossible to compute the ratio.
Second, the comparison of civil and criminal sanctions to the punitive award, which the United States Supreme Court requires us to consider, BMW, 517 U.S. at 583-87, 116 S.Ct. at 1603-04, cannot be made when the amount of punitive damages is unknown. In this case, comparison of a civil or criminal sanction to an unknown portion of the $2 million general award is meaningless.
Undaunted by the impossibility of applying the first two guideposts, the majority attempts to justify the unknown punitive award solely on the reprehensible nature of the defendant's conduct. The majority relies on the telephone call to Mrs. Crocker five days before Christmas informing her of a pending foreclosure on her home mortgage. However, it was not the defendant in this appeal, Union Security, that made the call. It was *1126 First Alabama. And when First Alabama made the call, it was acting as a foreclosing creditor, not as the sales agent for Union Security. First Alabama settled with Mrs. Crocker and is not subject to the unspecified punitive award here affirmed by the majority.
I would remand this case for the trial court to determine the amounts of punitive and compensatory damages,[2] because those amounts are necessary for a considered review.[3] Without the kind of information that we can obtain here only through remand, any review of the appropriateness of the punitive damages award is arbitrary.
An indispensable characteristic of a sound legal system is the production of predictable results. This guards against the arbitrary use of governmental power[4] and allows the bench, the bar, and, most importantly, the people to order their affairs.[5] This Court's punitive damages jurisprudence has failed to produce predictable results.[6] The fact that the majority inexplicably reduces the award here to $1 million makes the review process no less arbitrary.
The standards this Court established in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), are designed to prevent arbitrary punitive damages awards. As Justice Breyer observed in his concurrence in BMW, 517 U.S. at 597, 116 S.Ct. at 1609, however, this Court's application of those standards "violate[d] the basic guarantee of nonarbitrary governmental behavior that the Due Process Clause provides." That the misapplication of the three guideposts produces arbitrary results is illustrated by the majority's holding in the three cases decided since BMW:

 Punitive Compensatory
Case Award Award Ratio[7] Reprehensibility
BMW II[8] $ 50,000 $ 4,000 13:1 Low
Johnson II[9] $3,000,000 $250,000 12:1 High
Crocker II $ 985,437 $ 14,563[10] 68:1 Low

*1127 I dissent.
MADDOX, J., concurs.

On Application for Rehearing
BUTTS, Justice.
APPLICATION OVERRULED.
ALMON, SHORES, KENNEDY, and COOK, JJ., concur.
HOUSTON, J., concurs specially.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
HOUSTON, Justice (concurring specially).
I did not vote in this case when this Court affirmed a $2,000,000 award against Union Security Life Insurance Company, Union Security Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala.1995), judgment vacated, 517 U.S. 1230, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996), because I recuse myself in cases involving Regions Bank (formerly First Alabama Bancshares), which had been a party in this case. On remand from the United States Supreme Court, the issue was limited to whether the punitive damages assessed against Union Security Life Insurance Company were unconstitutionally excessive; therefore, there was no reason for me to recuse myself.
Whether the trial court erred in directing the jury to return a general verdict was not an issue on the original submission of this case to this Court. It appears that there was no request that any verdict for the plaintiff be broken down into separate awards of compensatory damages and punitive damages, and that there was no objection to the form of the verdict requiring, in case of a verdict for the plaintiff, a combined compensatory and punitive damages award. Therefore, I believe it was incumbent on this Court to resolve the excessiveness issue without a remand, based on established standards of review and established caselaw.
The invocation of our statutory authority to determine the proper amount of recovery and to affirm the judgment, subject to the plaintiff's filing of a remittitur of the amount in excess of the proper amount, is dependent upon our holding that the presumption of correctness of the jury verdict has been overcome by a clear showing that the amount of the verdict is excessive. It is also well understood that in considering the adequacy or excessiveness of a verdict, each case must be determined on its own facts and that neither the trial court nor this Court may substitute its judgment for that of the jury. Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
In dealing with compensatory damages, the interest of the uncompensated victim must always be kept foremost in mind. When considering punitive damages, however, the defendant's right to fair punishment must be considered above the plaintiff's right to recover the fullest amount of punitive damages. Wilson v. Dukona Corp., N.V., 547 So.2d 70 (Ala.1989), citing Layman v. Hendrix, 1 Ala. 212, 214 (1840), and Tatum v. Schering Corp., 523 So.2d 1042, 1048 (Ala. 1988) (Houston, J., dissenting). Accordingly, in a case such as this one, where the excessiveness vel non of a jury verdict presumably awarding both compensatory and punitive damages is an issue, the focus must be on the plaintiff with regard to the propriety of the compensatory damages award, and on the defendant with respect to the propriety of any assessment of punitive damages.
Applying these standards for reviewing the excessiveness issue in this case, I presumed, as did every other Justice on this Court, that the jury's general verdict included an award compensating the plaintiff. Because the *1128 plaintiff sought recovery for both economic loss and emotional distress, I had to further presume that the jury's compensatory award included damages for economic loss of around $16,222.61 (representing not only the $1,659.61 that the plaintiff and her husband had paid for the credit life insurance, but also the $14,563 outstanding balance on the loan, which the insurance policy was to have paid), as well as damages for emotional distress. Recently, I authored an opinion in First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala.1997), in which this Court upheld the jury's award of more than $400,000 in compensatory damages for emotional distress on the basis of the plaintiff's evidence of emotional distress arising from the defendant's fraudulent conduct that ultimately led to the foreclosure of the mortgage on the plaintiff's house. Based on that opinion, and on the fraud cases cited therein where this Court affirmed compensatory damages awards of well over $250,000 for emotional distress, see Duck Head Apparel Co. v. Hoots, 659 So.2d 897 (Ala.1995), and Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995), judgment vacated, 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996), on remand from the United States Supreme Court, 708 So.2d 111 (Ala.1997), and on this Court's affirmance of the $250,000 award of compensatory damages for emotional distress in Life Insurance Co. of Georgia v. Johnson, 701 So.2d 524 (Ala.1997), I concluded that the jury in this case could have awarded as much as $250,000 in damages to compensate the plaintiff for her economic loss and emotional distress and that such an award would not have been reduced by this Court, based upon the cases hereinbefore cited and others not cited. (There was not a foreclosure of the plaintiff's mortgage in this case. The foreclosure proceedings were halted, however, only after the plaintiff obtained legal counsel.) Assuming such an award of $250,000, which the evidence would support, that left a $750,000 punitive damages award approved by this Court; that award represented a 3:1 ratio of punitive damages to compensatory damages. This ratio is the benchmark against which I measure reasonableness. See BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) (Houston, J., concurring in the result).
I would have preferred that the jury enter separate awards for compensatory damages and punitive damages. Ala.Code 1975, § 6-11-1. I believe that either party has a right to demand that the verdict form submitted to the jury require that. However, if no party objects to the verdict form submitted and the jury returns a general verdict, then I believe this Court must assume that the general verdict includes the maximum amount of compensatory damages that this Court would affirm.
NOTES
[1] A contestability period is the time during which an insurance company may contest the validity of the insurance contract because of misstatements on the application. If a policy has a one-year contestability period and the insured lives for more than a year after coverage commences, the coverage becomes incontestable even if the application contained material misstatements. Under Alabama law, ordinary life insurance policies are incontestable after a maximum of two years. Ala.Code 1975, § 27-15-4. Credit life insurance policies are incontestable after only 12 months. See Ala. Ins. Reg. No. 28, § VI(J)(2) (1991).
[2] In Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986), this Court required "trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." I reiterate the necessity for trial courts to examine with specificity each of the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), in light of the evidence at trial and to reflect in the record how the final punitive award was determined.
[3] In my view, the appropriate review after remand would be based on the cogent analysis set forth in Justice Houston's special concurrence in BMW of North America, Inc. v. Gore, 701 So.2d 507, 516 (Ala.1997).
[4] Compare, e.g., 1 William Blackstone, Commentaries *46 (describing the Roman emperor Caligula's unjust practice of writing his laws in small characters and hanging them on high pillars, thereby facilitating arbitrary enforcement) with J.B. Bury, A History of Greece 179 (Modern Lib. ed.1937) (describing the Greek lawgiver Solon's just practice of inscribing his laws on wooden tables and placing them on revolving stands in the Public Hall of Athens, thereby facilitating consistent enforcement).
[5] As Justice Holmes stated:

"People want to know under what circumstances and how far they will run the risk of coming against what is so much stronger than themselves [i.e., public enforcement of judicial decrees], and hence it becomes a business to find out when this danger is to be feared. The object of our study, then, is prediction, the prediction of the incidence of public force through the instrumentality of the courts."
Oliver Wendell Holmes, Jr., The Path of the Law, in Collected Legal Papers 167, 167 (Legal Classics Lib. ed.1982).
[6] A majority of this Court has also rejected the Legislature's attempt to provide predictability. Compare Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993) (holding that the statute limiting punitive awards violated the Alabama Constitution) with BMW of North America, Inc. v. Gore, 517 U.S. 559, 593-97, 116 S.Ct. 1589, 1608-09, 134 L.Ed.2d 809 (1996) (Breyer, J., concurring) (citing favorably Texas, Connecticut, Florida, and Georgia statutes that limit punitive damages awards).
[7] These ratios are rounded to the nearest whole number.
[8] BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997).
[9] Life Ins. Co. of Georgia v. Johnson, 701 So.2d 524 (Ala.1997).
[10] This number represents the economic loss apparently suffered by Mrs. Crocker. The damages are computed by comparing her economic position when Union Security refused to pay the balance due on the loan with the position she would have been in had Union Security paid the balance due on the loan. In both instances, Mrs. Crocker would have paid the $1,660 in premiums to Union Security. In this instance, however, Mrs. Crocker did not receive the $14,563 payment from Union Security to pay off the loan.

Because the amount of compensatory damages in this case is unknown, I use Mrs. Crocker's apparent economic damages for purposes of illustration.