In 1990, Fred Lloyd and his wife, Faye Lloyd, entered into an installment contract with Gray Brown-Service Mortuary, Inc. ("Gray Brown Service"), for the purchase of a double-crypt space in the chapel section of the Forestlawn Mausoleum, which is owned and operated by Gray Brown-Service. Lloyd and his wife chose Forestlawn so that they could be entombed near Faye Lloyd's mother and sister. The purchase price of the space was $3,390. The contract provided for a 15% per annum interest rate, and, after a $100 down payment, the Lloyds were required to make 60 monthly payments of $78.27. The contract also provided that no entombment would be permitted until payment in full had been made for the crypt space.
The contract, written by Gray Brown-Service, also provided:
 "Section 10.3. That this agreement and the parties hereto shall be subject to the Rules and Regulations and provisions now or hereafter enacted by company concerning *Page 282 
said cemetery pertaining to the operation of said cemetery.
 "Section 11.3. PERPETUAL CARE: the company hereby binds itself to maintain the burial spaces or other interment facilities herein described, and to deposit from the purchase price of said burial spaces to a Care and Maintenance Fund created for the continual maintenance of all developed cemetery property without assessment to the Purchaser. Said deposit of the Perpetual Care Fund to be made upon final payment, of interment of entombment spaces purchased herein. The sum of said deposits to equal no less than ten percent (10%) of purchase prices of said spaces as shown above. THIS AGREEMENT PROVIDES FOR PERPETUAL CARE."
(Emphasis in original.)
Gray Brown-Services's rules and regulations, adopted before the Lloyds entered their contract, provided:
 "Section 3. CASKET NOT TO BE DISTURBED. Once a casket containing a body is within the confines of the cemetery, no funeral director, employee, or agent shall he permitted to open the casket or touch the body without the consent of the person or persons having legal control of the disposition of the remains, all heirs at law, and next of kin.
 "Section 4. SUBJECT TO LAWS, RULES AND REGULATIONS. Besides being subject to these Rules and Regulations, plots, crypts, property, property rights and matters covered herein, and all interments, disinterments and removals are made subject to the orders and laws of the properly constituted authorities of then City of Anniston, County of Calhoun and State of Alabama, and to the Certificate of Incorporation and By-Laws of the Corporation."
In 1991, Faye Lloyd died unexpectedly from a heart attack, at the age of 49. Fred Lloyd contacted Chapel Hill Funeral Home, Inc. ("Chapel Hill"), and requested it to provide funeral services for his wife. The total price of the services was $4,398.00, which included embalming his wife's body to sanitize and preserve the remains. The casket, which was included as one of the items covered by the price of the funeral services, was designed to preserve human remains in an air-tight and liquid-tight state. Before entombment at Forestlawn, the casket was locked and sealed. Unless the casket was damaged while it was being placed in the above-ground crypt, which was located in an air-conditioned building, the casket should have preserved the remains of Faye Lloyd.
Following the funeral service, Chapel Hill entrusted the casket to Gray Brown-Service for entombment in the Lloyd crypt space. The Lloyd crypt is located on the top level of the mausoleum, with five Crypts below it. The space itself is slightly taller, wider, and longer than a casket.
Employees of Gray Brown-Service used a scissor lift to raise the casket to the space. One of the employees then placed a handful of Bus throughout the space so that the casket could be placed in position and moved around easier. Once the casket was in position, the crypt was sealed with a fiberglass sealing plate and silicone caulk. A decorative stone face was then attached over the plate.
Jane Hill worked for Gray Brown-Service as the manager of the cemetery and mausoleum. She was in charge of operating and maintaining the mausoleum. Hill was a licensed funeral director, but did not know how the crypt spaces were drained or how they were ventilated. Franklin McGee, vice president of Gray Brown-Service, was in charge of business operations of Gray Brown-Service properties and interests.
In the summer of 1992, Harolyn Williams, whose father was entombed near the Lloyd crypt, telephoned Jane Hill and told her that the mausoleum had an odor smelling of decaying human remains. Hill told Ms. Williams that the odor was due to a sewage problem. In the fall of 1992, Ms. Williams again complained about the noxious odor in the mausoleum. Hill told Ms. Williams that the smell was due to the burial in a crypt at the mausoleum of a woman who had been dead in her driveway for three days before her body was discovered. *Page 283 
In the spring of 1993, Nathan Hall, a employee of Gray Brown-Service was asked to find the source of the odor. Hall traced the odor to the vicinity of the Lloyd crypt. He removed the decorative plate from the empty crypt underneath the Lloyd crypt and found a long crack through which fluids of a decomposing body were seeping and pooling on the floor of the vacant crypt. Because the Lloyd crypt was the only crypt above the vacant one, it had to be the source of the fluids. The only action taken at that time was to seal the vacant crypt Gray Brown-Service did not repair the crack in the Lloyd Crypt, and no effort was made to contact Fred Lloyd.
The odor became worse in the summer of 1993. Following a funeral service on Father's Day, at which many of the attendees held their noses during the service or left the mausoleum, Gray Brown-Service attempted to address the odor. Fluid from the Lloyd crypt had by then seeped through a crack in the vacant crypt to another vacant crypt below that one. Because the second vacant crypt was not sealed, the odor seeped into the public areas of the mausoleum.
Jane Hill, without permission of the Lloyd family and without the required permit from the Department of Public Health disinterred the remains of Faye Lloyd. Present at the disinterment were Gray Brown-Service employees Jane Hill, Nathan Hall, James Nail and Paul Starr. Larry Hill, the husband of Jane Hill was also present Everyone at the disinterment was asked to keep the matter secret. Jane Hill falsely to Nathan Hall that she had permission to open the crypt. Because of the odor coming from the casket, the casket was placed in the breezeway of the mausoleum.
An examination of the casket revealed many "pin-sized" rust spots and perforations over the entire length of its bottom. The rust and/or perforations were caused by the BBs that had been placed on the bottom of the crypt. Body fluids were escaping through the many pin-sized holes. Jane Hill directed that Faye Lloyd's casket be opened. Shortly before midnight, the lock on the casket was sawed off with a hacksaw and the lid was pried open with a crowbar.
Once the casket was open, Faye Lloyd's remains were exposed. Jane Hill directed Nathall Hall to distribute a caustic chemical called Viserock throughout the casket and on the remains of Faye Lloyd. Viserock is designed to absorb fluid, and it dries to a plaster-like cast. Nathan Hall testified that he tossed the Viserock "by the cupful" onto Faye Lloyd's chest, thoraic area, face, and neck.
The casket had been damaged so badly when it was opened that it could not be resealed. Duct tape was applied to hold the lid in place. Viserock was put on the body fluids that had pooled in the Lloyd crypt. The crypt space was not cleaned or sealed or repaired.
Jane Hill did not tell Gray Brown-Service's vice president, Franklin McGee, about the disinterment until after it had taken place. After learning of the disinterment, McKee made no effort to contact the Lloyd family. McKee testified that he "strongly suspected" that the BBs had caused the perforation in the casket. Instead of contacting the Lloyd family, McGee, several weeks later, ordered a second invasion of the Lloyd crypt. Again, the Lloyd family was not contacted, nor was the required permit obtained from the Department of Public Health. Employees of Gray Brown-Service opened the casket and physically removed the remains of Faye Lloyd and placed them in a plastic body bag. Body tissues and fluids were left behind in the original casket. A few pounds of Viserock was placed in the body bag with Faye Lloyd's remains. The remains in the body bag were then placed in a different casket, which was then reentombed in the Lloyd crypt. Again, the crypt was not cleaned and the crack was not repaired.
Following the reentombment, the original casket Fred Lloyd had purchased, which contained some fluids and tissues, was dumped near a wooden area adjacent to the cemetery. Days later, the casket was buried in an unmarked location. No photographs were taken of the casket, and Fred Lloyd and Chapel Hill employees were not allowed to inspect it before it was buried. *Page 284 
When Fred Lloyd was contacted by Gray Brown-Service, he was told only that there had been a minor problem with a leak in the crypt and that it had been taken care of by professionals. Mr. Lloyd was not told until later that his wife's crypt had been opened or that his wife's remains had been desecrated. Nathan Hall was fired for talking about the disinterment, along with another Gray Brown-Service employee who had helped to locate the members of the Lloyd family.
Fred Lloyd sued Gray Brown-Service, alleging the tort of outrage; trespass to the remains of Faye Lloyd; unlawful and warranted interference with the entombed remains of Faye Lloyd; unlawful and illegal disinterment of the remains of Faye Lloyd; wanton and willful desecration, injury, invasion, and mutilation of the remains of Faye Lloyd; abuse of a corpse; breach of contract; suppression; and failure to provide perpetual care for the tomb of Faye Lloyd. Fred Lloyd also sued Chapel Hill.
Before the judge charged the jury, the following occurred outside the presence of the jury:
 "COURT: All right. Now I want to make sure that I understand everyone's position so far as the verdict forms that the Court would submit in this case. And I want to get everybody bound to this and make sure there's not going to be any objection made after the fact.
 "On the record, it's my understanding from our precharge conference last evening that it's then desire of counsel for the defendants that I submit to the jury what we would call a general-verdict form. I'm going to submit verdict forms for each of the defendants in the claims against them. This is, a separate verdict form, one in favor of then defendants and, of course, one against each defendant. But it is simply going to be then the jury finding in favor of the plaintiff and against that particular defendant and assessing blank damages.
 "GRAY BROWN-SERVICE'S COUNSEL: That's correct.
 "COURT: Without any delineation as to particular cause of action. And without any delineation as to compensatory damages or punitive damages.
 "Is that correct on behalf of Chapel Hill, Mr. Bloom?
 "CHAPEL HILL'S COUNSEL: Yes, sir, Your Honor.
 "COURT: And, Mr. Fite, is that correct on behalf of your defendant, Gray [Brown-Service]?
 "GRAY BROWN-SERVICE'S COUNSEL: It is.
 "COURT: Is that satisfactory with the plaintiff?
 "PLAINTIFF'S COUNSEL: If that's what the defendants want, it's satisfactory with the plaintiff.
 "COURT: So there will be no objection to the Court's using those charges; is that correct?
 "GRAY BROWN-SERVICE'S COUNSEL: That's correct.
 "CHAPEL HILL'S COUNSEL: That's correct."
(R.T. 690-91.)
The jury returned a verdict in favor of Chapel Hill, but returned a general verdict against Gray Brown-Service in the amount of $2 million. Gray Brown-Service filed a motion for a remittitur of damages, which was denied. The court entered a judgment on the verdict. Gray Brown-Service appeals, but only from the trial court's denial of a remittitur. Lloyd does not appeal from the judgment in favor of Chapel Hill.
Gray Brown-Service argues that where the only claim for compensatory damages is based on an allegation of mental anguish,[1]
the court should apply a strict-scrutiny standard to determine whether the amount of the award is excessive, particularly where the evidence of mental anguish is relatively scant. Gray Brown-Service further argues that, assuming the amount this Court would consider the most the jury could properly have awarded as compensatory damages would be substantially less than the total *Page 285 
amount awarded, then the balance of the award should be considered punitive and that that amount would be excessive.
We note that Gray Brown-Service is appealing from the trial court's order denying its motion for a remittitur. Section6-11-1, Ala. Code 1975, provides that in tort actions. except wrongful-death actions, parties are entitled to have the fact-finder itemize its award as "past damages", "future damages", and "punitive damages". However, Gray Brown-Service expressly asked for a general-verdict form, which did not distinguish between compensatory and punitive damages.
This Court has been able to review a possible ratio of compensatory damages to punitive damages when a general verdict was used. In Union Sec. Life Ins. Co. v. Crocker, 709 So.2d 1118
(Ala. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1515,140 L.Ed.2d 668 (1998), a general-verdict form was used. Crocker
involved fraud based upon the intentional misconduct of a credit-life-insurance policy. With regard to the general verdict of $2 million against the insurance company, we stated that we could not determine with certainty the ratio of punitive damages to compensatory damages.
 "Certainly we do not consider the compensatory damages award to be based solely upon economic loss, as Justice See suggests in his dissent. Rather, we have thoroughly reviewed the compelling evidence of [the plaintiff]'s emotional and mental distress over [the insurance company]'s misconduct, as well as her economic loss, in determining the possible ratio of punitive damages to compensatory damages."
Crocker, 709 So.2d at 1121.
In this present case, we do not need to determine a possible ratio of compensatory damages to punitive damages, because the particular facts of this case would support an award of compensatory damages for mental anguish and would support an award high enough that, taking the remainder of the jury's award as punitive damages, the ratio of punitive to compensatory damages would not be unreasonable. It has long been the law of Alabama that mistreatment of burial places and human remains will support the recovery of damages for mental suffering. See Smith Gatson Funeral Directors, Inc. v. Wilson, 262 Ala. 401,79 So.2d 48 (1955); Holder v. Elmwood Corp., 231 Ala. 411, 165 So. 235
(1936); Bessemer Land Improvement Co. v. Jenkins, 111 Ala. 135,18 So. 565 (1895).
In Whitt v. Hulsey, 519 So.2d 901, 906 (Ala. 1987), the defendant/contractor owned land adjacent to an old family cemetery. After the defendant had been bulldozing near the cemetery, some gravestones were found broken. We held that the punitive damages award was proper:
 "We realize that there may be differences of opinion regarding the dividing line between merely offensive conduct and conduct that is atrocious and intolerable in a civilized society. Growth Properties I. v. Cannon, 282 Ark. 472, 669 S.W.2d 447 (1984). Great respect is afforded the resting place of the dead. See Kerlin v. Ramage, 200 Ala. 428, 76 So. 360 (1917); and Bessemer Land Improvement Co. v. Jenkins, 111 Ala. 135, 18 So. 565 (1895). This sentiment is repeated in Holder v. Elmwood Corp., 231 Ala. 411, 413, 165 So. 235, 237 (1936): `Our decisions lay much stress upon the sacredness of the resting ground of the dead . . ., and the exclusive right of interment and possession being shown, guard the spot against unlawful invasion and give a right of action for any illegal interference . . .' Under the particular facts of this case, and in view of the deep human feelings involved, we find the evidence sufficient to support the claim of outrageous conduct, where the alleged act was the desecration and destruction of a portion of a family burial ground."
519 So.2d at 906.
Gray Brown-Service knew in 1992 that there was an odor problem in the mausoleum and chose to do nothing about it. When it became unbearable for mourners to be inside the mausoleum, Gray Brown-Service, acting under the cover of night, swearing those present to secrecy, acting without permission of the family, and acting without the proper legal permits, pried open Faye Lloyd's casket with a crowbar. An employee of Gray Brown-Service then tossed a caustic chemical *Page 286 
on the remains of Faye Lloyd. Binding the casket with duct tape, Gray Brown-Service reentombed Faye Lloyd's body. Shortly thereafter, Gray Brown-Service again entered the Lloyd crypt, actually removed most of the remains of Faye Lloyd, and placed them into a body bag, while leaving some of the remains in the original casket, which it tossed into some woods and later buried in another location.
As to Gray Brown-Sevice's contention that there was scant evidence of mental anguish, we disagree. There was testimony that when Fred Lloyd learned of what had happened to his wife's remains he was angry and upset. (R.T. 547-48.) He testified that if, when he talked to Franklin McGee, he had known the details of what happened to his wife, he would have "hurt" McGee. (R.T. 586.) Lloyd testified that he had "been miserable since 1991, "when he found out what had actually happened. (R.T. 580.) He testified that he had nightmares about his wife's remains being in a body bag and about the chemical being thrown on her face. (R.T. 586.) He also stated that he was concerned as to whether his wife's remains were still in the crypt. (R.T. 588.) He said he has not moved her remains because she had desired to be buried near her sister and mother and because he did not want to disturb her remains again. (R.T. 582, 586.) He testified that when he thinks of good memories with his wife, he then recalls how her remains were mistreated by Gray Brown-Service. (R.T. 587.)
Given these facts, it is hard to question that Fred Lloyd suffered severe emotional distress. Suffice it to say, there was ample evidence to support the jury's award, based on the undignified and disrespectful manner in which Gray Brown-Service treated the remains of Faye Lloyd.
AFFIRMED.
ALMON, SHORES, and COOK, J.J., concur.
HOUSTON and LYONS, JJ., concur specially.
MADDOX and SEE, JJ., concur in the result.
HOOPER, C.J., dissents.
[1] Lloyd claimed compensatory damages based on breach of contract, as well as compensatory damages for mental anguish.